905 F.2d 1168
 59 USLW 2027
 Bilal Ali SALAAM, a/k/a Kevin Robinson and Khalil Al-Baaqee
Saleem Abdullah, a/k/a Willie Blevins, Appellants,
v.
A.L. LOCKHART, Superintendent of Arkansas Department of
Correction, and Larry Norris, Warden, Maximum
Security Unit, Arkansas Department of
Correction, Appellees.
Bilal Ali SALAAM, a/k/a Kevin Robinson and Khalil Al-Baaqee
Saleem Abdullah, a/k/a Willie Blevins, Appellees,
v.
A.L. LOCKHART, Superintendent of Arkansas Department of
Correction, and Larry Norris, Warden, Maximum
Security Unit, Arkansas Department of
Correction, Appellants.
 Nos. 89-2341, 89-2355.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 15, 1990.
Decided June 13, 1990.
Rehearing and Rehearing En Banc
Denied July 27, 1990.
 
 Richard T. Donovan, Little Rock, Ark., for appellants.
 Leslie M. Powell, Little Rock, Ark., for appellees.
 Before ARNOLD and BOWMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 In 1984, while incarcerated in an Arkansas state prison, Bilal Ali Salaam had his name legally changed by a state court after he converted to the Islamic faith. Salaam brought a pro se suit in 1986 seeking injunctive relief from the policy of Arkansas prison authorities to use only committed names on prison records and clothing, and in the mail room. The district court refused to appoint counsel and denied the claim in all respects. We reversed and remanded the matter for consideration under Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Salaam v. Lockhart, 856 F.2d 1120, 1123 (8th Cir.1988) (Salaam I). In particular, we noted that the easy availability of an "a/k/a alternative," the addition of Salaam's new name following his committed name on his clothing, in the prison records, and on the mail room delivery lists, might prove that the present prison policy was unreasonable. Id. The magistrate held a hearing and determined that the mail room policy was unreasonable but that the prison could continue to refuse to add Salaam's new name to his committed name in its files and on his clothing.[1] We hold that the state authorities must deliver mail to Salaam addressed to him only as Salaam and must allow the addition of Salaam's current name to his clothing. The state, however, need reform its record keeping only to the extent necessary to allow Salaam to receive services and information in his new name within the prison.
 
 I.
 
 2
 [P]rison is a complex of physical arrangements and of measures ... which determine the total existence of certain human beings (except perhaps in the realm of the spirit, and inevitably there as well) from sundown to sundown, sleeping, waking, speaking, silent, working, playing, viewing, eating, voiding, reading, alone, with others. It is not so with members of the general adult population. State governments have not undertaken to require members of the general adult population to rise at a certain hour, eat at certain hours, live for periods with no companionship whatever, wear certain clothing, or to submit to oral and anal searches after visiting hours, nor have state governments undertaken to prohibit members of the general adult population from speaking to one another, wearing beards, embracing their spouses, or corresponding with their lovers.[2]
 
 
 3
 Nevertheless, "[p]rison walls do not form a barrier separating prison inmates from the protections of the constitution." Turner, 482 U.S. at 84, 107 S.Ct. at 2259. Among those rights that they possess, prisoners retain the right to the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987).
 
 
 4
 Salaam subscribes to the Islamic faith.[3] He understands his faith to require his name to take on one of the attributes of God, and he finds his former name offensive to his beliefs. Tr. at 11-12.[4] A personal name is special. It may honor the memory of a loved one, reflect a deep personal commitment, show respect or admiration for someone famous and worthy, or, as in this case, reflect a reverence for God and God's teachings. Like a baptism, bar mitzvah, or confirmation, the adoption of a new name may signify a conversion and the acceptance of responsibilities of membership in a community. The defendants do not contest that Salaam's name change was religiously motivated, that his new name has spiritual significance, or that their policy infringes on his free exercise rights.[5] Instead, they argue that the policy reasonably reflects the state's interest in security and administrative efficiency.
 
 
 5
 Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests. Thornburgh v. Abbott, 490 U.S. ----, ----, 109 S.Ct. 1874, 1879-80, 104 L.Ed.2d 459, 471 (1989); O'Lone, 482 U.S. at 350, 107 S.Ct. at 2405; Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262-63. We consider four factors to determine if the regulation is reasonable: (1) whether it rationally and actually advances a neutral and legitimate government interest; (2) whether the prisoner has alternative means of exercising the same right; (3) the effect proposed accommodations will have on prison resources; and (4) whether the existence of "obvious, easy alternatives" that impose a de minimis cost reflect the regulation's lack of reasonableness. Turner, 482 U.S. at 89-91, 107 S.Ct. at 2261-63.
 
 
 6
 Our usual prefatory declaration that prisoners retain certain basic constitutional rights has meaning. We would misconstrue the recent Supreme Court decisions in Abbott, O'Lone, and Turner if we deferred not only to the choices between reasonable policies made by prison officials but to their justifications for the policies as well. " '[A] reasonableness standard is not toothless,' " Abbott, --- U.S. at ----, 109 S.Ct. at 1881-82, 104 L.Ed.2d at 473 (citing the government's certiorari petition). We must make sure after an independent review of the evidence that the regulation is not an exaggerated response to prison concerns. Abbott, --- U.S. at ----, 109 S.Ct. at 1883-84, 104 L.Ed.2d at 476; Turner, 482 U.S. at 96-99, 107 S.Ct. at 2265-67 (finding Missouri prison marriage regulations unreasonable after an independent review of the evidence). While we may not invalidate a regulation because we can imagine a more refined one, constitutional rights should be accommodated. We cannot validate prison regulations that are clearly broader in their scope or significantly more burdensome in effect than reasonable alternatives. Turner, 482 U.S. at 91, 107 S.Ct. at 2262-63 (relatively unburdensome alternatives can demonstrate unreasonableness).[6] Nor do alternatives have to be entirely cost-free; costs that are insubstantial in light of the overall maintenance of the prison are acceptable.
 
 
 7
 In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or prison staff, courts should be particularly deferential....
 
 
 8
 ... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.
 
 
 9
 Turner, 482 U.S. at 90, 107 S.Ct. at 2262. Our review is plenary. Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir.1989); Salaam I, 856 F.2d at 1122; Whitney v. Brown, 882 F.2d 1068, 1071 (6th Cir.1989).[7]
 
 II.
 
 10
 In our previous opinion, we noted the use of the a/k/a alternative in other cases and by the parties before us on all of their legal papers. Salaam I, 856 F.2d at 1123. We remanded this case for consideration of the a/k/a alternative, concluding that "[i]t may be that the a/k/a designation is the sort of 'obvious, easy alternative' which the Supreme Court specifically has directed the courts to examine under the fourth prong of the Turner criteria." Id.A.
 
 
 11
 On remand, Salaam explained the spiritual and practical significance of having the prison recognize his name change. In addition, he testified that he had not received mail sent to him under the name of Salaam. Tr. at 14, 24. He also indicated that he had been unable to cash money orders sent under that name. Tr. at 14. Salaam was most concerned that the prison recognize on his outer file jacket his new name and that he receive the normal incidents of recognition, including mail delivery and the cashing of money orders. Tr. at 50; id. at 28-29. Salaam testified that he could be called both names and that he would have no adverse reaction to the use of his former name, although he prefers his new name. Tr. at 20, 132. The inclusion of Salaam's new name on his clothing also would make it easier for his fellow inmates to call him by that name.
 
 
 12
 The Director of the Arkansas Department of Corrections, A.L. Lockhart, testified on his own behalf. He explained that there was a main file or jacket maintained at each institution for the incarcerated individual, arranged alphabetically, as well as other subsidiary files maintained in different locations respecting each inmate. Tr. at 54-55. Lockhart indicated that all files and forms included the inmate's commitment number, and the same number appears together with the inmate's name on his clothing. Tr. at 60, 111. He indicated that the file jacket also currently includes the aliases of each inmate. Tr. at 56. Lockhart testified that he was not sure what the a/k/a alternative would entail in terms of changes but that he was opposed to it. Tr. at 60. He estimated that there could be as many as 400 or 450 Muslim inmates throughout Arkansas prisons. Tr. at 52 (also noting that the figure is disputed). We set forth his concerns with respect to each aspect of the case.
 
 
 13
 Lockhart's primary reason for opposing the use of the a/k/a alternative on institutional files is his belief that all files would have to be changed and that it would be a burden to always write two names on any form. Tr. at 61-62, 71, 92-98; id. at 74 (no matter what relief was asked for, it would not "stop there"). In addition, he is concerned that adding a new name to files would cause confusion. For example, he argued that changing the prison record keeping would hurt the prison's ability to provide information to other law enforcement agencies during escapes or in reference to other inquiries. Tr. at 99. He is also concerned that inmates could be uncooperative if any paperwork they receive does not contain their new name. For example, he testified that he believed that if a parole order came in an inmate's former name, the inmate would refuse to leave prison. Tr. at 118. There was little testimony specific to mail delivery lists.
 
 
 14
 Lockhart also objects to the inclusion of changed names on inmate clothing. He believes that if guards persisted in using an inmate's former name, confrontations might occur. Tr. at 62, 71-72, 87. He is also concerned that it would frustrate inmate identification if an inmate were identified by only a new name and officials could not find the new name in their files. Tr. at 58.
 
 
 15
 The magistrate agreed with the defendants that the prison had a valid interest in accurate files, clothing that readily displayed an inmate's name for identification purposes, and efficient mail delivery. Memorandum and Order 3-4 (E.D.Ark. July 10, 1989). The magistrate concluded that continued use of an inmate's committed name validly and rationally furthered these interests. Without further analysis, the magistrate concluded that the prison's policy satisfied the first Turner factor. The magistrate decided that the second Turner factor also favored the defendants because Salaam had the opportunity to practice other aspects of his faith. Id. at 4. The magistrate concluded that the third Turner factor similarly favored the prison policy. He noted that there were 400-450 Muslim inmates and predicted that "those Muslim inmates similarly situated to the plaintiff would insist upon such alteration," in part, to clog the system. He predicted a "tidal wave of unproductive paperwork." Id. at 5. Finally, the magistrate concluded that the a/k/a alternative was itself unreasonable. With respect to record keeping, the magistrate felt that the paperwork was more onerous than any infringement of religious liberty. Id. at 6. The magistrate also concluded that the addition of a second name to clothing would seriously jeopardize institutional security by leading to confusion in the filing of reports and by provoking confrontations when guards continued to use an inmate's committed name. Id. at 7-8. The court concluded, however, that the inclusion of an inmate's new name on prison mail lists would not compromise any valid institutional interest. Id. at 8.
 
 B.
 
 16
 We agree with the magistrate that the validity of the policy itself, rather than the way it was applied to Salaam, is at issue. Accordingly, it was correct to analyze the potential effects of a change in the policy for similarly situated prisoners, even though this is not a class action. We also agree that other ways of exercising his religion remain open to Salaam. Nevertheless, we are unable to agree with some of the magistrate's conclusions.
 
 
 17
 First, the magistrate failed to appreciate the scope of the relief sought. For example, with respect to the first Turner factor, the magistrate analyzed only the state's interest in continued use of an inmate's committed name. Id. at 3. That is not at issue because Salaam does not request that the prison discontinue using his committed name. Similarly, Lockhart seemed confused as to the scope of the action. He did not always understand that Salaam agreed that the committed name would remain in use on the files. Tr. at 117. Lockhart's claim that the prison would be unable to assist law enforcement agencies during escapes under the a/k/a alternative presumes either the elimination of the committed name or the forced reorganization of the prison's internal records under Salaam's new name. Neither is requested.
 
 
 18
 Second, it is apparent from the language of the magistrate's decision that he may have improperly discounted the importance of the right at issue when balancing it against the administrative burden of adding Salaam's new name to the records. See Order at 5-6 ("unproductive paperwork;" "remote benefit to plaintiff's religious freedom"). In our first decision, we affirmed the magistrate's decision to exclude Salaam's expert witness who would have testified regarding the tenets of Islam. Salaam I, 856 F.2d at 1124. With no evidence in the record on the significance of a changed name other than Salaam's testimony, the magistrate could not minimize the religious importance of a conversion name, unless Salaam's testimony was unbelievable--which it is not.
 
 
 19
 We conclude that the magistrate overestimated the administrative interest in the policy and the effects of changing it and underestimated the significance of the religious right. We address Lockhart's concerns seriatim.
 
 
 20
 Initially, Lockhart is concerned with the administrative burden of making changes to institutional files. He never, however, estimated how much time it would take to make changes. Tr. at 130. He agreed that all that would have to be done is to type in the new name on each file. Tr. at 75. Even under the assumption that all paperwork would have to be changed, Lockhart testified that less than an hour of work per inmate would be required--how much less we do not know. Tr. at 76. Even if we accept his view that the prison could not stop at simply changing the jacket, the magistrate found that there were only eight active prison files. Order at 5. The burden of adding Salaam's new name to files and lists, while not imaginary, is nevertheless not onerous. Moreover, the prison is not required to change Salaam's name wherever it appears. In light of the relief requested, the prison must add his new name only to his file jacket and to lists with which inmates have frequent contact within the prison. The paperwork burden is minimal and we disagree with the magistrate's conclusion that the burden of changing eight folders is significant even where there are few requests for name changes. See id. at 5-6 (paperwork burden onerous even where minimum "ripple" effect); cf. McCabe v. Arave, 827 F.2d 634, 638 (9th Cir.1987) (storage and handling of books and study materials for inmate religious group imposes de minimis burden on prison resources). Our conclusion is buttressed by the prison's present practice of recording all aliases and using inmate commitment numbers in addition to committed names in its filing system.[8]
 
 
 21
 The magistrate also predicated his findings regarding the administrative burden of changes on Lockhart's belief that inmates similarly situated to Salaam would request use of the a/k/a alternative and Lockhart's estimate that there were 400-450 Muslims incarcerated statewide. There are several problems with this reasoning. First, there is no evidence in the record regarding the number of prisoners situated similarly to Salaam. The relevant group of similarly situated prisoners is composed of prisoners who will change faiths while incarcerated, adopt new names incident to their conversion that are legally cognizable, and request an accommodation. There was no evidence as to how many Muslim prisoners already had religiously inspired names. Many Muslim prisoners may have been committed under their Muslim names. Lockhart testified that he did not know how many prisoners have changed their names in the past. Tr. at 82. Second, there was no evidence that all name change requests would be granted by state courts simultaneously. There was no showing that additional paperwork by prison authorities would have to be done all at the same time. Third, the prison has the right to contest the sincerity of any name change. Fourth, there is no additional evidence in the record to support the theory that inmates will change names with malicious intent. Finally, given the minimal effort necessary to implement the alternative for each eligible inmate, even if many inmates over time requested accommodations, we cannot agree that this would make the current policy respecting record keeping reasonable. We believe in this regard that Lockhart's testimony and the magistrate's finding that hundreds of inmates would clog the system consist of conjecture and "the piling of conjecture upon conjecture." Reed v. Faulkner, 842 F.2d at 963.
 
 
 22
 Accordingly, we disagree with the magistrate's conclusion that the paperwork burden outweighs Salaam's religious interest in the use of his new name. We hold that the a/k/a alternative proves that the prison policy of excluding new names from its files and internal lists is unreasonable. For this reason, we affirm the magistrate's finding with respect to the mail lists. Other courts have reached similar conclusions. Barrett v. Virginia, 689 F.2d 498, 503 (4th Cir.1982) (name change prohibition unreasonable); Azeez v. Fairman, 604 F.Supp at 361 (a/k/a alternative protects administrative interests); Masjid Muhammad-D.C.C. v. Keve, 479 F.Supp at 1324; id. at 1325 (mail); see also Felix v. Rolan, 833 F.2d at 519 (prison's a/k/a alternative reasonable accommodation).
 
 
 23
 Our conclusion that the prison's refusal to alter its current record keeping practices is unreasonable is buttressed by the restrictiveness of the policy relative to the valid prison interests recognized by Arkansas' elected officials. At the time Bilal Ali Salaam changed his name, Arkansas allowed any citizen to petition a court for a name change. Ark.Code Ann. Sec. 9-2-101(a) (1987). State law provided that "[a]ny person whose name may be so changed by judgment or decree of any of the courts shall afterward be known and designated, sue and be sued, plead and be impleaded, by the name thus conferred." Ark.Code Ann. Sec. 9-2-102 (1987). In 1985, Arkansas amended section 101(a) to deprive its courts of the power to grant name changes requested by state prisoners. In 1987, Arkansas removed the 1985 amendment to section 101(a), and instead amended section 102 to require that regardless of name changes, the "records of persons under the jurisdiction and supervision of the Department of Correction shall continue to reflect the name as committed to the Department's jurisdiction and supervision ..." See Ark.Code Ann. Secs. 9-2-101, 9-2-102 (Supp.1989). State law thus does not prohibit the addition of a second name to prison records. After repeated consideration in recent years, Arkansas has made a deliberate judgment to permit inmates to change their names, providing only that prison authorities may continue to use committed names in prison records. The policy of the Department of Corrections with respect to its records thus far exceeds in its scope the administrative interests recognized by state law. The a/k/a alternative which permits continued use of committed names in prison records as Arkansas requires demonstrates the unreasonableness of the current practice.
 
 
 24
 Next, Lockhart opposes the addition of Salaam's new name where his former name and commitment number appear on his clothing. Lockhart fears confrontation and misidentification. He testified that there would be no problem using the committed name, commitment number, and new name together on clothing provided that the inmates would respond to any of three. Tr. at 60-61. He doubted that inmates would remain congenial, however, when called by their former name. Tr. at 62. He also testified that guards who called Salaam by his new name at present were violating department policy which allows only the name or number on the inmate's shirt to be used. Tr. at 65; id. at 86 (not strictly enforced).
 
 
 25
 The potential for confrontation exists under the present system because the current policy prohibits guards from ever using Salaam's legal name. Lockhart testified that there are currently inmates who will not respond to their committed names. Tr. at 62. The a/k/a alternative, in contrast, grants guards the ability to use the name an inmate wishes to be called by and makes his name immediately observable. We cannot say, however, that Lockhart's concerns are unfounded. Some inmates might take any opportunity to cause trouble. It is not apparent, however, why the addition of Salaam's new name would cause a net increase in the incidence of confrontation. Moreover, if the rights of those who would cooperate could be sacrificed in fear of those who would cause trouble under any regime, officials could ignore any individual right. Inmates do not abandon their rights to individualized judgments about their behavior. Salaam has testified that he would respond to his former name, his commitment number, or his new name. Lockhart offered no evidence that Salaam has ever caused a problem since 1984, when his name was changed. Existing policies give prison officials the right to discipline those who do not follow orders. The prison may certainly withdraw the a/k/a alternative from any prisoner who is informed that he must respond to a former name and who repeatedly fails to do so. We also wish to emphasize that, in the alternative, guards can be instructed to make an effort to use prisoners' legal names. Guards should not deliberately "bait" inmates, and we cannot justify the prison policies on any such propensity. The imposition on the prison staff would be clearly de minimis.[9]
 
 
 26
 We similarly cannot accept Lockhart's fear of misidentification. The a/k/a alternative does not eliminate the display of the committed name and number on the inmate's clothing. To the extent a disciplinary violation is reported only under an inmate's new name, there should be no problem in identifying the inmate because under the a/k/a alternative, the prison must also record the new name in its files. Lockhart's fear is based on the current record keeping practice.
 
 
 27
 Q. I take it from that you mean that if Bilal was to attack another inmate and that inmate came to you and said, "This guy named 'Bilal' attacked me," and you would go through your records and you couldn't find anybody named Bilal; is that--
 
 
 28
 A. That's correct.
 
 
 29
 Tr. at 58. Moreover, the situation is no different from that which currently exists with the use of nicknames within the prison. We find the refusal of the defendants to add Salaam's legal name to his clothing to be unreasonable.
 
 III.
 
 30
 Accordingly, the judgment of the magistrate is affirmed in part and reversed in part. This matter is remanded to the magistrate for the entry of injunctive relief consistent with this opinion.
 
 
 
 [1]
 The magistrate also dismissed the claim of a second plaintiff, who had been paroled, for failure to prosecute. He does not appeal
 
 
 [2]
 Morales v. Schmidt, 340 F.Supp 544, 550 (W.D.Wis.1972) (Doyle, J.), rev'd 489 F.2d 1335 (7th Cir.1973) (remanded for consideration under a different standard)
 
 
 [3]
 He identifies his affiliation as being with the world community of Islam and indicated that he is not a member of any particular sect. Hearing Transcript 32 (May 22, 1989) (Tr.)
 
 
 [4]
 "The adoption of Muslim names by inmates practicing that religion is generally recognized to be an exercise of both first amendment speech and religious freedom." Felix v. Rolan, 833 F.2d 517, 518 (5th Cir.1987) (per curiam) (citing cases); see also Azeez v. Fairman, 604 F.Supp 357, 361 (C.D.Ill.1985), rev'd in part, 795 F.2d 1296 (7th Cir.1986) (damage award overturned on qualified immunity grounds). It is common practice for a convert to change his name as the Koran provides, and the former Anglo name is thought to be a badge of a spiritually unenlightened state and a relic of slavery. Masjid Muhammad-D.C.C. v. Keve, 479 F.Supp 1311, 1321-22 (D.Del.1979). New names are generally drawn from the ninety-nine attributes of God. See Maulana Muhammad-Ali, The Religion of Islam 159 (1983) (listing)
 
 
 [5]
 See Salaam I, 856 F.2d at 1124 (affirming the magistrate's exclusion of an expert witness on the Muslim faith because of the defendants' concessions)
 
 
 [6]
 The reasonableness test does not obviate the need for accommodation. Reasonableness in this context refers not only to the relation between the goals of a regulation and its means, but also to the balance struck between the needs of the prison administrators and the constitutional rights of prisoners. Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir.1988) (Posner, J.). " 'In sum, there must be [a] mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' " Salaam I, 856 F.2d at 1122 (quoting Hill v. Blackwell, 774 F.2d 338, 340 (8th Cir.1985), quoting Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974)); id. at 1124
 
 
 [7]
 We do not believe that the Supreme Court's recent decision in Employment Div., Dep't of Human Resources v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1989), affects our analysis. Smith does not alter the rights of prisoners; it simply brings the free exercise rights of private citizens closer to those of prisoners
 
 
 [8]
 The magistrate made no finding with respect to Lockhart's claim that the use of an a/k/a alternative would lead to filing confusion, an inability to properly assist law enforcement agencies in identifying inmates during an escape, or the refusal of inmates to leave the prison if their release order came in their former name. As indicated, the prison is not required to reorganize its files. Moreover, we imagine that the inclusion of a new name, much like the recording of an alias, would be of value to other agencies
 
 
 [9]
 The policy the defendants ultimately develop will no doubt be consistent with their desire to avoid confrontational situations