**Harry Burke FRINK, Jr., Plaintiff,**

v.

**C/O Tony ARNOLD; Bernard Eaves; Paul W. Grossheim; Charles Higgins; and K.W. Schmidt, Defendants.**

No. 4–91–CV–30495.

United States District Court, S.D. Iowa, C.D.

Jan. 27, 1994.

Jeffrey M. Lipman, Des Moines, IA, for plaintiff.

Suzie A. Berregaard Thomas, Asst. Atty. Gen. for the State of Iowa, for defendants.

**MEMORANDUM OPINION AND ORDER**

BENNETT, United States Magistrate Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND 1186
II. FINDINGS OF FACT 1186
III. CONCLUSIONS OF LAW 1188
  A. Introduction 1188
  B. The "Reasonable Relationship" Test 1189
    1. Rational Connection Between Restriction and Governmental Interest 1190
    2. Alternative Means of Exercising the Restricted Right 1191
    3. Accommodation of the Right on Staff and Inmates 1192
    4. The Existence of Alternatives 1192
  C. Conclusion 1192

Plaintiff Harry Burke Frink, Jr., an inmate in the Iowa correctional system, filed this 42 U.S.C. § 1983 action, alleging that Defendants, correctional personnel at the Mount Pleasant Correctional Facility ("MPCF"), Mount Pleasant, Iowa, violated his First Amendment rights under the U.S. Constitution by seizing his fictional writings and requiring him to send them out of the institution. Frink seeks declaratory and injunctive relief as well as compensatory damages.

## I. Introduction and Procedural Background

Frink filed a *pro se* complaint on August 9, 1991 in the United States District Court for the Northern District of Iowa. At that time Frink was an inmate at the Iowa Men's Reformatory ("IMR") in Anamosa, Iowa. However, the acts complained of in the *pro se* complaint occurred at the MPCF in Mount Pleasant, Iowa which is in the Southern District of Iowa. On August 9, 1991, then United States District Court Judge David R. Hansen entered an order transferring this case to the United States District Court for the Southern District of Iowa.[1] On September 19, 1991, Frink moved for appointment of counsel which was granted on September 26, 1991. On October 7, 1991 counsel with considerable experience in prisoners' rights litigation entered his appearance on behalf of Frink.

On July 20, 1992, pursuant to 28 U.S.C. § 636(c), the parties consented to trial of this matter before the undersigned United States magistrate judge. In lieu of a trial on the merits, the parties elected to submit this case on a stipulated record. Post-trial briefs have been filed and the matter is now fully submitted.

## II. Findings of Fact [2]

Frink was previously incarcerated at MPCF, a medium security correctional facility located in Mount Pleasant, Iowa. Frink was committed to the Iowa Department of Corrections on August 30, 1979 to serve consecutive 25 year sentences for two counts of sexual abuse in the second degree and two counts of kidnapping in the second degree. Frink was transferred to MPCF from the IMR on February 7, 1990.[3]

MPCF houses approximately 820 inmates who are housed in two wings, east and west. Approximately 410 inmates are housed in the west wing, and approximately 230 of these inmates are enrolled in the Sex Offender Treatment Program ("SOTP") offered at IMR. Inmates enrolled in the SOTP are housed in either unit 2A or 2B. One correctional officer is assigned per unit at MPCF. Defendant Tony Arnold is a correctional officer at MPCF. At all times relevant to this case, Arnold was the unit officer for unit 2A. Approximately 68 inmates are assigned to unit 2A.

While at IMR, Frink had begun writing fictional prose. His goal is to become a professional writer. Frink has had rather limited success in achieving this goal having had one short story published in an Iowa community college magazine. When Frink was transferred to MPCF he took his written work with him. Frink continued his writing activities once he arrived at MPCF.

Frink enrolled in the SOTP when he arrived at MPCF, as well as an alcohol and drug treatment program, and was assigned to unit 2A. When Frink enrolled in the SOTP he signed a "treatment contract." [4]

---

1. Judge Hansen was elevated to the United States Court of Appeals for the Eighth Circuit on November 18, 1991.

2. The findings of fact are drawn from the depositions of Tony Arnold, Bernard Eaves, Dudley Allison, Charles Higgins, and Harry Burke Fink, and the exhibits submitted by the parties.

3. Frink is currently an inmate at IMR.

4. The treatment contract signed by Frink dated February 9, 1990, stated as follows:

> I, Harry Burke Frink, hereby enter into an agreement with the Mt. Pleasant Correctional Facility to allow their staff to provide me with treatment services. I understand and agree to the following conditions regarding my treatment.
> 1. I agree to be completely honest and assume full responsibility for my offenses and my behavior.
> 2. I will attend all treatment sessions, and attend on time.

All inmates who wish to enroll in the SOTP are required to sign a treatment contract.

On March 16, 1990, Arnold conducted a routine "shakedown" of Frink's cell at MPCF.[5] During his search, Arnold came across Frink's writings. Upon cursory review of some of the materials, Arnold concluded that the writings might constitute contraband which was unauthorized under the SOTP. Arnold seized the writings and took them to Defendant Bernard Eaves' office. Eaves is a correctional counselor at MPCF, and is assigned to unit 2A. Eaves was Frink's primary counselor while he was in the SOTP.

Eaves read a small portion of the materials, and concluded that at least some of the writings were "very inappropriate" for an inmate in the SOTP.[6] Eaves then reviewed some of Frink's written materials with his supervisors, Mr. Custer and Dudley Allison, the treatment director at MPCF. Custer directed Eaves to review all of the materials with Frink, and to separate out any materials that Eaves felt were inappropriate. Factors the staff at MPCF consider in determining whether written materials are inappropriate for an inmate in the SOTP are whether the writings contain violence, violence and sex linked together, illegal sexual conduct, or sexual situations involving minors. The existence of such items in inmate written materials is considered by MPCF's treatment staff to be counterproductive to the SOTP inmates because inmates' fantasies about actions reinforce negative behavior and negative thoughts.[7]

On March 30, 1990, Frink filed an inmate grievance concerning the decision to remove his writings. On April 5, 1990, Frink's grievance was denied by Defendant K.W. Schmidt, a grievance officer at MPCF. On April 6, 1990, Frink filed an inmate grievance appeal. On April 13, 1990, Defendant Charles Higgins, MPCF's Deputy Superintendent, denied Frink's appeal. In his response, Higgins stated:

> At this time no material has been denied, even though the grievant admits there are some stories he has written which would be found contrary to his programming needs. The grievance is denied in that restrictions placed on the grievant are reasonable under the treatment contract for the Sex Offender program. It is felt that the grievant needs to decide if he is going to accept the restrictions placed on him and will comply with the requirements of the program.

3. I will notify the appropriate staff member as soon as possible about any situation that affects my attendance or promptness.

4. I agree to take the Pre-test and Post-test psychological test battery and answer each item as honestly as possible.

5. I will not disclose any information regarding another inmate. Disclosure of such information will be grounds for possible termination from the program.

6. I will actively participate in group sessions to the satisfaction of staff and other group members.

7. I will not become verbally threatening or assaultive towards any staff member, volunteer or inmate.

8. I will maintain behavior which is judged as appropriate by the staff. All major reports will be considered a serious matter with assaultive, threatening or sexual misconduct as grounds for possible termination from the program.

9. I agree to complete all written assignments in a timely fashion, and will attend all assigned meetings and classes.

10. I understand that I may be required to transfer to IMCC for an evaluation.

11. I have read the orientation material for the Sex Offender Treatment Program (SOTP)

12. I agree that I will not have pictures of my victim(s) nor will I write to my victim(s) unless approved by the treatment team.

13. I understand that the treatment staff have the right to limit my access and receipt of any materials which would be judged detrimental to my treatment process.

14. I understand that I will be restricted from visiting my victim(s) unless approved by the treatment staff. Specific procedures for approval will be provided to me upon request.

**5.** Arnold, who worked from four p.m. to midnight in unit 2A during Frink's incarceration, was required to conduct at least two cell searches per night.

**6.** Frink's writings totaled approximately 1600 pages.

**7.** The parties apparently dispute whether Frink completed the SOTP, with Frink testifying that he did so while Defendant Eaves testifying that Frink did not complete the program. Because determination of this factual question is unnecessary to resolution of this case, the court makes no factual finding as to this issue.

voluntarily or is more interested in an attempt to further his "writing career." This may be a difficult decision for the grievant to arrive at and he should work with his counselor concerning this matter. Concerning the materials consisting of an apparent 27 files of paper, this is somewhat of a time consuming endeavor for the counselor to review, however, it should be completed as expeditiously as possible.

Eaves subsequently met with Frink and went through the writings with Frink. This session took one full afternoon. Eaves found approximately one-half of the 1600 pages of writings to be inappropriate. Frink was given the choice of having the materials destroyed or mailed out of the institution. Frink chose the latter option, and the materials were mailed to his sister in California.

Frink's writings which were mailed out of MPCF consisted of drafts of short stories, rough play outlines and character outlines. The materials contain descriptions of sexual activity, illegal sexual transactions and acts of male on female violence.[8]

### III. Conclusions of Law

#### A. Introduction

■ Initially, the court recognizes that the following principles guide the court's consideration of this case. Although inmates may forfeit many valued freedoms and liberties upon being incarcerated, they nonetheless do retain at least some of their constitutional rights during confinement. At a minimum, prisoners are to be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objects of incarceration. *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64

(1987); *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); *Timm v. Gunter,* 917 F.2d 1093, 1099 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991). Thus, "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259.

■ An equally important precept is that prisoners' constitutional rights may be significantly limited or substantially constrained in order to further legitimate objectives of the penal system. Thus, "[t]he limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives— including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). In balancing these factors, "the evaluation of penological objectives is committed to the considered judgment of the prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *Id.* at 349, 107 S.Ct. at 2404 (quoting *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979)); *see also Iron Eyes v. Henry,* 907 F.2d 810, 812 (8th Cir.1990) ("[I]ssues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, particularly ill-suited to judicial resolution....").[9]

■ This wide-ranging deference to the determinations of prison administrators is not boundless. "It is equally certain that '[p]rison walls do not form a barrier separat-

---

**8.** An example of the materials which were deemed inappropriate was Frink's manuscript for *Cry for the Child.* The plot of this story centers on a prostitute in an unnamed inner city who is ultimately purchased and set free by an old boyfriend. The story contains both graphic descriptions of women's bodies, and sexual activities.

**9.** In *Turner,* the United States Supreme Court indicated that the deference to be accorded prison officials arrives in part from separation of powers principles:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning,

and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner,* 482 U.S. at 84–85, 107 S.Ct. at 2259–60; *see also Lopez v. Robinson,* 914 F.2d 486, 490 (4th Cir.1990) (The United States Supreme Court "has persistently reminded lower courts that considerations of separation of powers and institutional competence suggest the need for judicial restraint....").

ing prison inmates from the protections of the Constitution.'" *Abbot,* 490 U.S. at 407, 109 S.Ct. at 1878 (quoting *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259). In discharging their duties, federal courts must protect the constitutional rights of prison inmates in the face of a prison regulation or practice which offends a fundamental constitutional guarantee. *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969); *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259.

With these general principles in mind, the court will now address the appropriate standard to be applied to Frink's First Amendment challenge.

### B. The "Reasonable Relationship" Test

In *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), the Court set out the following rational relationship test: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *See also* *O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404. In adopting this test, the Court observed:

[o]ur task . . . is to formulate a standard of review of prisoners' constitutional claims that is responsive both to the "policy of judicial restrain regarding prisoner complaints and [to] the need to protect constitutional rights."

*Turner,* 482 U.S. at 85, 107 S.Ct. at 2259.[10] The Supreme Court subsequently applied the *Turner* "reasonable relationship" test in *Thornburgh v. Abbott,* 490 U.S. 401, 404, 109 S.Ct. 1874, 1877, 104 L.Ed.2d 459 (1989), in which the Court upheld Federal Bureau of Prisons' regulations which restricted inmates' access to certain publications.

In applying the "reasonable relationship" test, the Court in *Turner* set out four factors which are "relevant to, and serve to channel, the reasonableness inquiry." *Id.* at 414, 109 S.Ct. at 1882. These four factors are: first, whether a rational connection exists between the restriction and the legitimate governmental interest which is employed as a justification of it; second, whether alternative avenues of exercising the right remain open to the inmate; third, whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources; and, finally, whether obvious, easy alternatives to the restriction exist.[11] *Abbott,* 490 U.S. at 414–418, 109 S.Ct. at 1882–84; *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62.[12] Employing this rubric, the court will address Frink's as applied constitutional challenge to Defendants' restrictions on his possession of certain written materials that he composed.[13] However, as this court has previously noted,

[b]ecause the *Turner* factors were developed in the context of facial constitutional challenges, they may or may not lend themselves to an "as applied" analysis, de-

---

**10.** The Court went on to note that the "reasonable relationship" test was necessary

if "prison administrators .., and not the courts, [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative prob-

lem, thereby "unnecessarily perpetuat[ing] the involvement of federal courts in affairs of prison administration."
*Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62 (citations omitted).

**11.** The Court adopted these four factors after scrutinizing and synthesizing factors considered in its decisions in earlier "prisoner rights" litigation. *Abbott,* 490 U.S. at 414, 109 S.Ct. at 1882.

**12.** For a more detailed analysis of the historical underpinnings of the "reasonable relationship" test, see this court's prior opinion in *Nichols v. Nix,* 810 F.Supp. 1448, 1456–59 (S.D.Iowa 1993).

**13.** Frink does not challenge the facial validity of the restrictions placed on inmates in the SOTP.

pending on the facts and circumstances of any given case.

*Lyon v. Grossheim,* 803 F.Supp. 1538, 1552 (S.D.Iowa 1992). As a result, the court will address each of those factors to the extent they are applicable to the analysis. *See Skelton v. Pri–Cor, Inc.,* 963 F.2d 100, 103 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1682, 118 L.Ed.2d 398 (1992) (only alternative means factor applied).[14]

### ▮ *(1) Rational Connection Between Restriction and Governmental Interest.*

The first *Turner* factor requires the court to examine whether the underlying objective of the restriction is legitimate, and whether the restriction is rationally related to that objective. Defendants assert that the restriction on inmates in the SOTP furthers the governmental interest in rehabilitating sex offenders. Rehabilitation, of course, is a legitimate penological objective.[15] *See O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404; *see also Procunier v. Martinez,* 416 U.S. 396, 413–14, 94 S.Ct.

1800, 1811–12, 40 L.Ed.2d 224 (1974); *Dawson v. Scurr,* 986 F.2d 257, 260 (8th Cir. 1993); *United States v. Stotts,* 925 F.2d 83, 86 (4th Cir.1991); *Siddiqi v. Leak,* 880 F.2d 904, 909 (7th Cir.1989); *Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir.1978); *Sundby v. Fiedler,* 827 F.Supp. 580, 583 (W.D.Wis. 1993); *Bressman v. Farrier,* 825 F.Supp. 231, 235 (N.D.Iowa 1993).[16]

Thus, the next question which must be addressed is whether the government's interest in rehabilitation of sexual predators is rationally related to MPCF's restriction on the SOTP inmates possessing sexually graphic writings. Dudley Allison, MPCF's treatment manager, testified regarding the adverse effects associated with permitting the SOTP inmates to possess sexually explicit writings:

> If the source or the person who wrote the material is the person who's directly involved in the sexual offenders program,

**14.** Decisions of the United States Court of Appeals for the Eighth Circuit, subsequent to the Court's holdings in *Turner* and *Abbott,* have routinely applied these four factors and the "reasonably related to a legitimate penological interest" test to determine whether prison regulations impermissibly impinge on prisoners' constitutional rights. *See, e.g., Smith v. Delo,* 995 F.2d 827, 830–32 (8th Cir.1993) (inmate challenged prison regulation requiring outgoing mail to news organizations or religious groups be sent to prison mailroom unsealed for inspection), *cert. denied,* —— U.S. ——, 114 S.Ct. 710, 126 L.Ed.2d 676 (U.S.1994); *Dawson v. Scurr,* 986 F.2d 257, 260–61 (8th Cir.1993) (inmate challenged restriction on the viewing of sexually explicit materials); *Abdullah v. Gunter,* 949 F.2d 1032, 1035 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Griffin v. Lombardi,* 946 F.2d 604, 607 (8th Cir.1991) (inmate brought action against prison officials for refusing to deliver his original diploma and transcripts); *Goodwin v. Turner,* 908 F.2d 1395, 1399 (8th Cir.1990) (inmate sought habeas corpus relief after denial of his request that he be permitted to artificially inseminate his wife); *Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th Cir.1990) (Native American inmate sought relief against enforcement of rule requiring all prisoners to wear their hair above their collars); *Salaam v. Lockhart,* 905 F.2d 1168, 1170–71 (8th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991) (inmate who changed his name after imprisonment challenged prison's "committed name" policy); *Blankenship v. Gun-*

*ter,* 898 F.2d 625, 627 (8th Cir.1990) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Smith v. Erickson,* 884 F.2d 1108, 1110 (8th Cir.1989) (inmate sought to have prison officials enjoined from enforcing prison-canteen-only-envelope policy, refusing to mail legal correspondence, and refusing to supply free postage and envelopes).

**15.** Although the SOTP at issue in this case was a voluntary program, federal courts have concluded that the rehabilitation of sexual offenders "is a legitimate penological interest sufficient to overcome [an inmate's] limited liberty interest in refusing treatment." *Sundby,* 827 F.Supp. at 583. On a similar note, courts have held, in the case of voluntary sexual offender programs, that inmates wishing to participate may be required to accept responsibility for their crimes. *See Russell v. Eaves,* 722 F.Supp. 558, 560 (E.D.Mo. 1989) (holding that requirement of sexual offender program that inmates accept responsibility for crimes did not violate Fifth Amendment), *appeal dismissed,* 902 F.2d 1574 (8th Cir.1990).

**16.** In *Dawson,* the Eighth Circuit determined that a prison regulation which restricted inmates viewing of sexually explicit materials to a reading room was reasonably related to the penological interest of rehabilitation. *Dawson,* 986 F.2d at 260. The court of appeals concluded that if sexually explicit materials were permitted in inmates cells they would "likely be passed around and find their way into the cells of psychologically unfit inmates, interfering with their rehabilitation." *Id.*

and even beyond that, if it's a past perpetrator of a violent or sexually aggressive offense, sure, that's considered. We find that even more dangerous for a person that's involved in these writings, you know, reading it, fantasizing, and so on. We find that negative to the treatment process.

Allison went on to state:

> If [SOTP inmates are] involved in negative writing and readings, say, for ten hours a day, where being in groups it's an hour and a half a day, we're certainly not going to make any progress. That's what I'm talking about when I talk about being counterproductive.
>
> We have to get to a point where the positive things we're encouraging and trying to help them learn about themselves and life in general about relationships and so on, that that's the emphasis of what's going on with them as opposed to kind of sliding through group and giving us maybe lip service, and spending many hours, or whatever, with encouraging the same feelings maybe they had before, the same behaviors.
>
> We know that the guy who comes into the institution wasn't making it, wasn't fitting into society, hurting people. In this case, sex offenders always have a victim. He has to change. That's the bare minimum. If he leaves the exact same way he comes in, no progress.

Allison's testimony regarding the effects that inmate possession of sexually graphic written materials have on rehabilitative efforts was uncontradicted by Frink.[17] Mindful of the wide-ranging deference that courts must give to the decisions of prison administrators, the court concludes that Defendants have established a rational connection between the restriction at issue in this case and the governmental interest in rehabilitating sex offenders in the SOTP.[18] *See Guajardo,* 580 F.2d at 762 (holding that certain sexually explicit materials which "encourage deviate, criminal sexual behavior" in the prison setting could be restricted from prison environment since they interfered with rehabilitation interest of prison in preventing homosexual acts).

*(2) Alternative Means of Exercising the Restricted Right.* The restriction at MPCF is not a total ban on inmate writing, but only a restriction on certain limited subjects that inmates in the SOTP are not permitted to write. Here, not all of Frink's work were ordered out of MPCF, only those works which contained sexually explicit material which would interfere with his rehabilitation in the SOTP.[19] Thus, MPCF's prohibition on certain writing topics did not prevent Frink from writing on other topics. Indeed, the written materials which Frink was required to mail out of MPCF would probably have passed muster if edited. Therefore, the court concludes that Frink had alternative means of exercising his right to produce writ-

17. Deference to prison officials' judgment is particularly appropriate here because Frink failed to adduce any expert testimony to contradict Allison's opinion on the issue of the effect of Frink's writing on the treatment objectives of the SOTP. While the court was not overly impressed with either Allison's qualifications or his opinions, deference is appropriate where no record evidence contradicts the prison official's opinion on penological objectives and the opinion itself it not, on its face, arbitrary or unsupportable.

18. In arriving at this conclusion, the court notes that it has not considered those factual assertions contained in Frink's submission to the court entitled Plaintiff's Statement to the Court. The text of the submission, apparently prepared by Frink himself, contains factual statements unsupported by the record intermixed with legal arguments critical of Defendants' arguments. In particular, Frink's allegations that the SOTP inmates are permitted to have magazines containing nudity, books containing sexually explicit content, and view video tapes of movies with themes of sex and violence, are all unsupported by the record in this case. If established, such allegations would impact upon the legitimacy of Defendant's justification for the restriction at issue in this case. However, because Frink did not develop the record on this point, the court is unable to include such factual allegations in conducting its *Turner* calculus.

19. Frink mailed the writings he was not allowed to keep to his sister in California. Whether Iowa correctional officials would allow these materials to be returned to Frink because he is no longer in the SOTP, or were under a duty to hold Frink's writings for him pending completion of the SOTP, raise interesting constitutional questions. However, the court does not understand Frink to have raised them—therefore the court will not address them.

ten materials while undergoing treatment in the SOTP at MPCF.

**(3) Accommodation of the Right on Staff and Inmates.** The third *Turner* factor requires examination of "the impact accommodation of the asserted constitutional right will have on guards and other inmates...." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott*, 490 U.S. at 418, 109 S.Ct. at 1884. As discussed above in relation to the first *Turner* factor, the effect of permitting inmates in the SOTP to retain sexually explicit writings would impair the SOTP's staff's rehabilitation efforts. A possible consequence of permitting inmates freedom to engage in counterproductive rehabilitative activities would be that the correctional staff would have to modify their current rehabilitative efforts, if possible, to counteract the negative effects caused by inmates' possession of sexually graphic materials. It is therefore clear that there are costs associated with permitting inmates in the SOTP to retain sexually explicit writings.[20]

**(4) The Existence of Alternatives.** The final *Turner* factor requires the court to explore whether obvious, easy alternatives to the restriction exist. "[T]he existence of [such] alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Here, one possible alternative to exclusion of an entire story would be for prison officials to particularize those portions of an inmate's stories which would possibly interfere with his rehabilitation in the SOTP and then permit the inmate to excise those marked segments. Such an approach would permit the inmate to continue his work on a writing project while also educating him about what types of writings are deemed to be inappropriate in the SOTP. This alternative would permit inmates to retain those portions of stories which do not interfere with the rehabilitation efforts of the SOTP.

The availability of this alternative to Frink's stories cannot be ascertained on the record before the court, however, because it is not clear here whether MPCF officials objected to entire story lines or only to particular segments. The record is devoid of specificity as to what portions of Frink's writings would be permitted sans the explicit sexual language. Thus, because the record does not reveal the extent to which MPCF officials objected to Frink's materials, the court cannot state that Defendants' actions here constituted exaggerated responses to the finding of inappropriate materials in Frink's writings.

### C. Conclusion

The court concludes that, under the four factor *Turner* analysis, MPCF's restriction, as applied, on Frink's possession of sexually explicit written materials is reasonably related to a legitimate penological interest, the rehabilitation of sexual offenders. In reaching this conclusion the court is compelled, on the basis of the record evidence and the lack of expert testimony on Frink's behalf, to grant deference to the judgment of prison administrators in their attempt to strike a balance between the constitutional rights of inmates and the legitimate goal of a correctional institution to rehabilitate sexual offenders.

### ORDER

It is, therefore, the order and judgment of the court that judgment be entered for Defendants.

---

**20.** In *Guajardo*, 580 F.2d at 762, the Fifth Circuit upheld restrictions on the introduction of sexually explicit materials that would "exacerbate" non-consensual homosexual acts in Texas prisons. Here, however, Defendants have not introduced any evidence that Frink's writing would have such an effect on inmates in MPCF.